WILDMAN, HARROLD, ALLEN AND DIXON, Plaintiff-Appellee, v. ROBERT GAYLORD, Defendant-Appellant (Virginia Gaylord, Defendant).

First District (1st Division)  No. 1—99—4301

Opinion filed November 20, 2000.

Terrance M. Heuel, of Chicago, for appellant.

Arnold H. Landis, of Chicago, for appellee.

JUSTICE COHEN delivered the opinion of the court:

Plaintiff Wildman, Harrold, Allen & Dixon (Wildman) filed a breach of contract action against defendants Robert and Virginia Gaylord to recover attorney fees. Plaintiffs sought $56,869.34 in attorney fees and $1,553.34 in costs for legal services rendered on behalf of defendants in the areas of estate planning and corporations law. After a bench trial, the trial court entered a judgment against defendant Robert Gaylord in the amount of $43,316 for attorney fees and $529.09 in costs. No judgment was entered against defendant Virginia Gaylord, who was deceased at the time of trial. Robert Gaylord now appeals the trial court's judgment order of September 22, 1999, contending that the trial court: (1) "abused its discretion" by awarding attorney fees without following the dictates of controlling case law; and (2) erred in awarding Wildman an amount that was not supported by the manifest weight of the evidence. We affirm the trial court's judgment and find that: (1) during a bench trial, the trial judge sits as the trier of fact and does not exercise broad discretionary powers

when determining the reasonableness of attorney fees; (2) "manifest weight of the evidence" is the sole standard of review when a judgment awarding attorney fees follows a trial on the merits; (3) an attorney-plaintiff seeking to recover fees from his own client pursuant to a breach of contract or *quantum meruit* theory is not required to present "detailed contemporaneous time records" in order to sustain his burden of establishing that the attorney fees sought are reasonable; and (4) the trial court's judgment was supported by the manifest weight of the competent evidence.

## I. BACKGROUND

Defendant Robert Gaylord initially contacted Stewart Dixon, a partner in the Wildman firm, in January 1989 regarding the possible dissolution of his marriage. Dixon consulted with Gaylord about his financial standing and legal rights in the event he decided to proceed with a divorce. Dixon's review of Gaylord's tax returns, financial statements and business records indicated that he was a man of substantial wealth. Instead of instituting divorce proceedings on Gaylord's behalf at this time, Dixon encouraged Gaylord to attempt a reconciliation.

Gaylord contacted Dixon again in July 1991 indicating that he wanted to meet and discuss "urgent" matters. At their initial meeting on July 18, 1991, Gaylord advised Wildman attorneys of a certain corporate action that was scheduled to be taken within the next 10 days by the board of directors of the Robelm Holding Company, Inc. (Robelm). At that time, Robelm's only holding was approximately 30% of the stock in Ingersoll International Inc. (Ingersoll), a closely held family machine tool business. Gaylord owned shares in Ingersoll directly and also possessed beneficial interests in various trusts that held Ingersoll shares. Gaylord's brothers, Edmon and Clayton, sought to maintain control over the voting stock in Ingersoll by creating a voting trust with their combined shares. The actions threatened by Gaylord's brothers would have effectively frozen Gaylord out of control over Ingersoll for 30 years. These actions would also have had a material impact on Ingersoll dividends, a substantial source of Gaylord's income.

At the close of the July 18, 1991, meeting, Gaylord orally entered into a contract for legal representation, with the Wildman firm and agreed to be billed for legal services at Wildman's customary hourly rates. Over the course of the next three months, Wildman performed extensive legal services on Gaylord's behalf in the areas of corporations law, estate planning and taxation. In October 1991, Wildman sent Gaylord a billing statement seeking payment of $56,869.34 in attorney fees and $1,553.34 in costs for legal services rendered on Gay-

lord's behalf. Gaylord refused to pay the Wildman bill. After several unsuccessful demands for payment, Wildman filed an action for breach of contract in the circuit court of Cook County. Following a bench trial, the trial court entered a judgment in favor of Wildman for $43,316 in attorney fees and $529.09 in costs. Defendant appeals.

## II. STANDARD OF REVIEW

The initial issue that we must address is the applicable standard of review when a trial court's judgment awarding attorney fees is challenged. In determining the proper standard of review, it is critical that we first isolate the procedural mechanism through which plaintiff sought relief. In the case at bar, the judgment for attorney fees followed a bench trial on Wildman's breach of contract action. Wildman sought legal fees for services performed on behalf of defendants pursuant to a contract for legal representation.

On appeal, both plaintiff and defendant argue that the trial judge "exercised his discretion" when determining reasonable attorney fees and that the judgment should be reversed if we find an abuse of discretion. The parties' assertions are misguided. Preliminarily, it should be noted that the cases cited by the parties on this point are inapposite. Unlike the case at bar, a breach of contract action brought by an attorney-plaintiff, the cases cited by the parties as authority involve fee petitions brought in the context of an underlying action in which the attorney performing legal services was not a party. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 981-82 (1987) (lease provision required lessee to pay "all costs and expenses" of lessor including attorney fees); *Fitzgerald v. Lake Shore Animal Hospital, Inc.*, 183 Ill. App. 3d 655, 658-59 (1989) (trial court granted lessor's fee petition pursuant to fee-shifting provision in lease); *Prior Plumbing & Heating Co. v. Hagins*, 258 Ill. App. 3d 683, 687-89 (1994) (trial court awarded plaintiff reasonable attorney fees pursuant to Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1998))); *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1067-68 (1993) (trial court awarded plaintiff reasonable attorney fees and costs in foreclosure action pursuant to provision in trust deed); *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 685 (1994) (trial court awarded plaintiff reasonable attorney fees pursuant to "fee-shifting" provision in lease).

In each of the above-cited cases, petitioners were parties to an underlying lawsuit who sought an award of attorney fees against an opposing party pursuant to a "fee-shifting" agreement or statutory provision. See *Kaiser*, 164 Ill. App. 3d 978. "Fee-shifting" provisions are exceptions to the long-standing general rule that the unsuccessful

litigant in a civil action is not responsible for the payment of the opponent's attorney fees. *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 1048 (1998); *Chicago Title & Trust Co.*, 248 Ill. App. 3d at 1072; *Kaiser*, 164 Ill. App. 3d at 983.

In fee petition cases, the trial judge's familiarity with the underlying litigation allows him to independently assess the necessity and reasonableness of the legal services rendered. *In re Estate of Healy*, 137 Ill. App. 3d 406, 411 (1985). Significantly, if a trial court denies a petition seeking fees pursuant to a "fee-shifting" clause, the successful litigant's attorney is still entitled to payment from his own client. For these reasons, when ruling on a fee petition, the trial court has broad discretionary powers in awarding the attorney fees sought and its decision will not be reversed unless the court has abused its discretion. *Kaiser*, 164 Ill. App. 3d at 984; *In re Estate of Healy*, 137 Ill. App. 3d at 411; *Lurie v. Canadian Javelin Ltd.*, 93 Ill. 2d 231, 239 (1982); *Leader v. Cullerton*, 62 Ill. 2d 483, 488 (1976).

The parties' misapprehension regarding the proper standard of review likely stems from the fact that two Illinois cases cite "abuse of discretion" as the applicable standard of review of a trial court's judgment awarding attorney fees without regard to the critical fact that the procedural vehicle chosen by plaintiffs to recover attorney fees in those cases was a civil trial on the merits rather than a fee petition. *Muller v. Jones*, 243 Ill. App. 3d 711, 714 (1993); *Neville v. Davinroy*, 41 Ill. App. 3d 706, 711 (1976).

In *Muller*, a Fourth District case, a discharged attorney filed a civil action against its former client seeking recovery of attorney fees on a *quantum meruit* theory. Prior to his discharge, the plaintiff-attorney had performed legal services on behalf of defendant in a personal injury action. Following a bench trial on the merits, the trial judge awarded plaintiff $2,500 in attorney fees, plus $72.20 in court costs. *Muller*, 243 Ill. App. 3d at 712.

Relying on *Mars v. Priester*, 205 Ill. App. 3d 1060 (1990), and *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978 (1987), the *Muller* court held that the trial court's judgment resulted from an "abuse of discretion" because the evidence and testimony presented by defendant at trial were not sufficiently specific to justify the trial judge's award. Accordingly, the appellate court reduced the trial court's judgment to $485.45 in attorney fees, plus $72.20 in court costs. The *Muller* court quoted the following passage from *Mars* as the applicable standard of review governing a judgment awarding attorney fees:

> "In all cases where an award of attorney fees is appropriate, only those fees which are reasonable will be allowed, the determination of which is left to the *sound discretion* of the trial court."

(Emphasis added.) *Mars v. Priester*, 205 Ill. App. 3d at 1064-65, citing *Kaiser*, 164 Ill. App. 3d 978.

In *Neville*, a Fifth District case, a plaintiff-attorney filed an action alleging breach of an express oral contract for legal representation against his former client for legal services rendered at the contractual rate of $35 per hour in 10 different matters over a four-year period. The trial court, sitting as trier of fact in a bench trial, found that there was "an oral contract for services rendered with no mention of price involved." *Neville*, 41 Ill. App. 3d at 707. The *Neville* court further stated, "[i]n the allowance of attorney fees, courts may exercise their independent judgment and the amount thereof rests in their *sound discretion*." (Emphasis added.) *Neville*, 41 Ill. App. 3d at 711, citing *Richheimer v. Richheimer*, 59 Ill. App. 2d 354, 365 (1965) ("fee-shifting" provision in the divorce act gives trial court discretion in awarding attorney fees incurred by petitioner in the prosecution of the suit). Similar to the *Muller* court's reliance on *Kaiser*, the *Neville* court relies on *Richheimer* to support its proposition that "abuse of discretion" is the proper standard of review for *all* cases where attorney fees are the subject of the dispute. We disagree.

■ Contrary to the facts presented in *Muller* and *Neville* (bench trials on the merits), both *Kaiser* and *Richheimer* involved fee petitions brought as collateral proceedings to underlying actions. In ruling, the *Muller* and *Neville* courts failed to address the critical fact that there are fundamental differences between the standard of review and burden of proof applicable in cases where a party to an underlying action files a "fee petition" seeking a *discretionary* award of fees against the losing party and those cases where an attorney-plaintiff files a "civil action for breach of contract" seeking payment of fees from a former client. In light of this critical distinction, we find that the *Muller* and *Neville* courts erred in their application of the law. We decline to follow their analyses.

When deciding whether to grant a fee petition, trial courts have broad discretionary powers, may exercise their independent judgment and are not limited to the evidence presented by the parties in arriving at a reasonable fee. *In re Estate of Healy*, 137 Ill. App. 3d at 411. A trial court has the discretion to independently review and consider the contents of the entire court file in determining whether a party is entitled to fees and whether the fees requested are reasonable. *Kaiser*, 164 Ill. App. 3d at 986. It should be noted that an additional policy consideration in cases involving "fee-shifting" provisions is that the attorney for the successful litigant has no individual right to seek payment from the losing party. Stricter scrutiny by the trial court is warranted in these circumstances because the attorney submitting billing

statements for approval by the trial court has no fiduciary relationship with the party ultimately liable for payment of the fees.

In *Kaiser*, the appellate court recognized the need for heightened scrutiny in fee petition cases. The court stated that a *"petition for fees must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor."* (Emphasis added.) *Kaiser*, 164 Ill. App. 3d at 984, citing *Fiorito v. Jones*, 72 Ill. 2d 73 (1978). The *Kaiser* court further stated that "[b]ecause of the importance of these factors, it is incumbent upon the petitioner [in a fee petition case] to present detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." *Kaiser*, 164 Ill. App. 3d at 984, citing *Flynn v. Kucharski*, 59 Ill. 2d 61 (1974).

Unlike findings in a fee petition case, which rest in the sound discretion of the trial judge, the reasonableness of attorney fees in a common law breach of contract action presents a question to be resolved by the trier of fact, following a fair and impartial trial. *Laff v. Chapman Performance Products, Inc.*, 63 Ill. App. 3d 297, 308 (1978). In civil actions brought by attorney-plaintiffs to recover compensation for professional services performed under an alleged contract, the usual rules governing breach of contract actions apply because "[t]he liability to pay for legal services stands upon the same footing as other agreements." *Sokol v. Mortimer*, 81 Ill. App. 2d 55, 64 (1967). However, a reviewing court is free to set aside an oppressive verdict for attorney fees as it would "any other verdict which is contrary to the manifest weight of the competent evidence." *Slater v. Jacobs*, 56 Ill. App. 3d 636, 643 (1977); *Sullivan v. Fawver*, 58 Ill. App. 2d 37, 45 (1965). The law is clear. "It is not the province of this court to substitute its judgment for that of a jury" in a breach of contract action seeking attorney fees unless there is a "patent error wherein the weight of the evidence demands a contrary conclusion." *Sokol*, 81 Ill. App. 2d at 64; *Sullivan*, 58 Ill. App. 2d at 44; *Slater*, 56 Ill. App. 3d at 643; *Laff*, 63 Ill. App. 3d at 306-10.

The fact that a judgment is rendered after a bench trial with the judge sitting as the "trier of fact" as opposed to a jury does not alter this standard of review. A trial judge's conclusions on factual issues are entitled to the same weight as a jury verdict. *Johnson v. Abbott Laboratories, Inc.*, 238 Ill. App. 3d 898, 905 (1992); *Brown v. Zimmerman*, 18 Ill. 2d 94, 102 (1959). Moreover, when a judge sits as the "trier of fact" in a bench trial, the judge is presumed to have considered only competent evidence presented by the parties at trial. *Buckner v. Causey*, 311 Ill. App. 3d 139, 145 (1999). A court's consideration of matters outside the trial record is prejudicial error

which can result in a reversal of its judgment. *Buckner*, 311 Ill. App. 3d at 145.

In determining the reasonableness of attorney fees in a bench trial, the judge does not exercise "broad discretionary powers." A trial judge cannot abuse his discretion by determining that attorney fees are reasonable in a civil trial on the merits because "discretion has nothing to do with the issue." *Buckner*, 311 Ill. App. 3d at 142. To hold otherwise would result in a different standard of review in breach of contract actions depending on whether plaintiff filed a jury demand or proceeded with a bench trial. This result, defying common sense, is not supported by the case law. Accordingly, as in any other civil breach of contract action, we hold that the sole question on review is whether the trial court's judgment for attorney fees and costs was against the "manifest weight of the evidence." *Buckner*, 311 Ill. App. 3d at 142; *Brody v. Finch University of Health Sciences/Chicago Medical School*, 298 Ill. App. 3d 146, 153 (1998).

## III. BURDEN OF PROOF

Preliminarily we note that much of defendant's argument on appeal centers around the trial court's failure to apply the standards outlined in *Kaiser* and *Fitzgerald* to the case at bar when ruling on the reasonableness of attorney fees. *Kaiser*, 164 Ill. App. 3d at 983-84; *Fitzgerald*, 183 Ill. App. 3d at 661-62. As we hold that the rules of law espoused in *Kaiser* and *Fitzgerald* are limited to cases involving "fee petitions," defendant's arguments that the trial court abused its discretion in this regard are without gravitas. Accordingly, we also reject defendant's argument that plaintiff's burden of proof in a common law action seeking attorney fees pursuant to a breach of contract or *quantum meruit* theory includes "detailed, contemporaneous time records" with the heightened level of specificity required by *Kaiser* and *Fitzgerald*.

In an action for attorney fees based on a breach of contract or *quantum meruit* theory, the plaintiff-attorney's *prima facie* case includes proof of the following: (1) the existence of an attorney-client relationship, (2) the nature of the services rendered, (3) the amount of time expended, and (4) the result, if any, obtained for the client. *Greenbaum & Browne, Ltd. v. Braun*, 88 Ill. App. 3d 210, 213-14 (1980); *Ross v. Wells*, 6 Ill. App. 2d 304, 308 (1955). A plaintiff-attorney must also furnish sufficient facts and computations to establish, by a preponderance of the evidence, that the services rendered were necessary and that the amount of fees sought is fair, just and reasonable. *Greenbaum*, 88 Ill. App. 3d at 215; *Laff*, 63 Ill. App. 3d at 308 (plaintiffs presented sufficient evidence to justify the hours spent and the resulting fee).

In a civil trial, the necessity of legal services performed and the reasonableness of the amount charged are questions of fact. *Laff*, 63 Ill. App. 3d at 308; *Slater*, 56 Ill. App. 3d at 642. The trial judge, sitting as the trier of fact, decides these issues based on the weight of the competent evidence. Evidence sufficient to support a civil judgment for attorney fees may be comprised solely of witness testimony. *Slater*, 56 Ill. App. 3d at 643 (although attorney testified that he kept no records, testimony that he expended 150 hours, multiplied by the usual and customary fee of $60 per hour, supported award of $9,000 total fee).

## IV. TRIAL COURT'S AWARD IS SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE

■ The next issue we address is whether the trial court's judgment in favor of Wildman was supported by the evidence. A trial court's judgment is against the manifest weight of the evidence when its findings appear to be unreasonable, arbitrary, or not based on the evidence. *Buckner*, 311 Ill. App. 3d at 143, quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). On appeal, the reviewing court must take questions of testimonial credibility as resolved in favor of the prevailing party and must draw from the evidence all reasonable inferences in support of the judgment. *H&H Press, Inc. v. Axelrod*, 265 Ill. App. 3d 670, 679 (1994). A reviewing court will not reverse a trial court's decision if different conclusions can be drawn from contradictory testimony unless an opposite conclusion is clearly apparent. *Buckner*, 311 Ill. App. 3d at 144, citing *DeLong v. Cabinet Wholesalers, Inc.*, 196 Ill. App. 3d 974, 979 (1990).

■ We must give great deference to the trial court's findings because the trial court, as the trier of fact, is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive. *Buckner*, 311 Ill. App. 3d at 144; *Brody*, 298 Ill. App. 3d at 153. Where the determination of the case depends largely upon the facts found in the record, the findings and judgment of the trial court "will not be disturbed by the reviewing court if there is *any* evidence in the record to support such findings." (Emphasis added.) *Schioniger v. County of Cook*, 116 Ill. App. 3d 895, 899 (1983); *Brown v. Zimmerman*, 18 Ill. 2d at 102. In order to warrant reversal, "the appellant must present evidence that is so strong and convincing as to overcome, completely, the evidence and presumptions, if any, existing in the appellee's favor." *Raclaw v. Fay, Conmy & Co.*, 282 Ill. App. 3d 764, 767 (1996). Moreover, this court may affirm the judgment upon any ground warranted, regardless of whether it was relied on by the

trial court and regardless of whether the reasons given by the trial court are correct. *Cronin v. McCarthy*, 264 Ill. App. 3d 514, 523 (1994). With these standards as our guide, we address Gaylord's arguments on appeal.

Defendant contends that the billing statements presented by Wildman at trial demonstrate that the amount of the trial court's award was against the manifest weight of the evidence. Specifically, defendant argues that the trial court awarded Wildman three-fourths of the $56,869.34 sought in its complaint despite the fact that the trial judge made an express finding that litigation was never authorized by Gaylord and that any fees related solely to litigation would not be awarded. As unauthorized litigation-related activities accounted for approximately two-thirds of the billing entries, defendant argues that a proper award of fees could only include $14,282.50, at most.

Defendant also maintains that the judgment entered in this case was against the manifest weight of the evidence because Wildman's billing statement collectively listed all tasks performed by individual attorneys on a given date. As the billing statement gives a daily total for time spent on all tasks as opposed to a calculation of time spent on each individual task, defendant contends that the trial court had no accurate method of discerning the amount of time spent on noncompensable, litigation-related activities. Defendant further argues that the trial court erred by entering a judgment for less than the full amount claimed without making a ruling on each separate billing entry.

Finally, defendant argues that the judgment for attorney fees is against the manifest weight of the evidence because (1) the total 310.25 hours billed by Wildman reflects a duplication of effort by multiple attorneys; (2) the services performed by Wildman were of no benefit to Gaylord; and (3) Wildman did not meet its burden of establishing that the services performed by various attorneys were fair, just and reasonable. Defendant's arguments fail.

At trial, attorney Dixon testified that Gaylord orally entered into a contract for legal services with the Wildman firm. Dixon further testified that Gaylord agreed to be billed for legal services at Wildman's customary hourly rates. Dixon informed Gaylord that hourly rates ranged from his rate of $248 per hour down to $70 per hour for paralegals and law clerks, depending on the skill or expertise of the individual. While stating that the best practice is to have a written attorney-client agreement, the trial judge accepted Dixon's testimony that it was not the practice of the Wildman firm to memorialize representation agreements. The trial judge's ruling indicates that he concluded, after hearing conflicting testimony, that Gaylord consented

to representation by the Wildman firm. Therefore, despite Gaylord's testimony to the contrary, we find that there is sufficient evidence in the record to support the trial judge's determination that an express contract existed between Gaylord and Wildman.

■ Where an attorney and client enter into an express contract for representation, the terms of the express contract control the compensation due the attorney. *Greenbaum*, 88 Ill. App. 3d at 213; *Slater*, 56 Ill. App. 3d at 638. Unlike fee petitions and claims for *quantum meruit* fees, in which the trial court makes an independent valuation of reasonable attorney fees, where an express contract governs the compensation due an attorney, the hourly rate agreed to by the parties is the starting point of the court's analysis. "Clearly, when an express contract exists, a resort to *quantum meruit* principles is unnecessary because the attorney and client have already agreed on the value of the services." *Laff*, 63 Ill. App. 3d at 310. Nevertheless, compensation due an attorney pursuant to an express contract must still satisfy certain professional standards. See *Nottage v. Jeka*, 172 Ill. 2d 386, 397 (1996). Rule 1.5 of the Illinois Rules of Professional Conduct requires that all fees for legal services be reasonable. 134 Ill. 2d R. 1.5(a). Thus, no matter what procedural mechanism is used to recover attorney fees, the following factors should be considered in determining the reasonableness of the fees sought:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent." 134 Ill. 2d R. 1.5(a).

■ We next address whether there is "any" evidence in the record to support the trial judge's determination that $43,316 was the amount owed to Wildman pursuant to its contract for legal representation with Gaylord. Defendant argues that Wildman failed to meet its burden of establishing that the charges were reasonable. We disagree. Considering the factors outlined in Rule 1.5 of the Illinois Rules of

Professional Conduct, we find that the record is replete with evidence that the attorney fees awarded pursuant to the terms of the express contract were fair, just and reasonable.

Dixon testified that he had been an attorney in Illinois since 1957 and was a founding partner of the Wildman firm. Wildman is a general practice firm employing 180 attorneys. Dixon testified that the corporate issues that Gaylord hired the Wildman firm to resolve were "time sensitive," "enormously complex" and involved "millions of dollars."

Dixon further testified that Gaylord's estate planning issues were equally complex. Upon his death, Gaylord's interests in Ingersoll would yield an estate valued at approximately $40 million. Without proper planning, the tax liability on Gaylord's estate could have been up to $10 million. Dixon testified that the valuation of Gaylord's Ingersoll shares for estate tax purposes was directly affected by the resolution of the corporate actions that were soon to be undertaken by Gaylord's siblings.

Dixon conceded that Gaylord elected not to file the complaint prepared by Wildman that sought to enjoin the impending corporate action by the Robelm board of directors. Dixon also conceded that neither Gaylord nor his wife ever executed the wills drafted by Wildman. However, Dixon maintained that Gaylord received "first rate" legal representation on complex issues requiring a high degree of knowledge and skill. Gaylord also received the benefit of an expert evaluation of his legal position.

Dixon testified that all of the legal work performed by Wildman attorneys was necessary and reasonable. Dixon denied that Wildman's billing statement included any duplication of effort by multiple attorneys. Dixon stated that Wildman's fees were actually lower than the fees customarily charged by attorneys in Chicago at that time. Dixon further testified that Gaylord terminated his representation agreement with the Wildman firm sometime after October 31, 1991, when he received a billing statement indicating that his charges were $56,869.34 in attorney fees and $1,553.34 in costs for legal services rendered to date. Gaylord repeatedly refused to pay the amount owing Wildman under their contract for legal representation, which resulted in Wildman instituting the instant action. Dixon testified that Wildman had never before sued a client to recover fees.

By agreement of the parties, the evidence deposition of Richard Thies was presented at trial in lieu of his appearance. Thies testified that he was a partner in the Wildman firm and had been associated with Wildman since 1988. Thies specialized in estate planning and closely held corporations since his graduation from law school. Thies

billed Gaylord at an hourly rate of $215, which at the time was 10% to 15% less than the rates charged by other Chicago attorneys for similar services. Thies testified that the estate planning issues he handled on Gaylord's behalf were difficult and complicated. Theis' involvement in Gaylord's representation included: drafting wills for Gaylord and his wife; analyzing a 1967 trust agreement created by Gaylord's deceased father; and evaluating potential estate taxes in the event of Gaylord's death. Thies further testified that the Gaylords could have saved $500,000 if they had followed the recommendations made by Wildman regarding their estate plans.

John McGovern testified that he was a partner in the Wildman firm at the time Gaylord was a client. McGovern had a high degree of skill in the areas of securities and corporate law. McGovern billed Gaylord at a rate of $210 per hour, which was on "the low side" compared to the rates charged by other Chicago area lawyers for similar services. McGovern testified that the 53 hours he billed on the Gaylord file were reasonable both in scope and the amount of time expended in light of the complex corporate issues presented.

McGovern testified that the legal matters Gaylord sought to resolve were multifaceted corporate law issues. McGovern characterized the actions that were going to be taking by the Robelm board of directors as a classic corporate "squeeze-out." Gaylord's brothers owned enough shares in both Robelm and Ingersoll to give them a "swing" vote once those shares were combined into a voting trust. Such a "squeeze-out" would have been detrimental to Gaylord's interests as he faced losing voting control over Ingersoll for 30 years under this scenario. McGovern testified that the work he performed on Gaylord's behalf included: researching and reviewing the charters and bylaws of both Robelm, a New York corporation, and Ingersoll, a Delaware corporation; researching the relevant statutes and the large body of case law regarding corporate "squeeze-outs"; evaluating whether a remedy existed in equity based on the self-dealing nature of the transactions initiated by Gaylord's brothers; and evaluating the effect on Gaylord's legal interests in the event that the "squeeze-out" could not be avoided.

McGovern further testified that the Robelm board of directors met at the end of July 1991 and effected the anticipated changes to the corporate structure of Ingersoll. At this point, the focus of the Wildman attorneys shifted from trying to prevent this transaction to evaluating Gaylord's options in light of his minority shareholder status. On September 17, 1991, Wildman attorneys met with Gaylord and his wife to review their legal options. Wildman proposed filing a lawsuit in equity to void the transactions conducted by the Robelm

board of directors. Wildman also proposed an "exit strategy" whereby Gaylord and his immediate family could negotiate a sale of their Ingersoll stock at a fair price to either the corporation itself or Gaylord's siblings. Finally, McGovern testified that Gaylord did not take any actions on Wildman's recommendations and subsequently terminated his representation agreement with the Wildman firm.

Gaylord was the sole defense witness. Gaylord testified that in 1983 he retired from Ingersoll, a family-owned machine tool business started by Gaylord's grandfather in 1887. Gaylord began his employment at Ingersoll in 1939 and worked there for the majority of his adult life. Gaylord's educational background included: private grade school in Rockford, Illinois; high school diploma from Phillips Exeter Academy in Exeter, New Hampshire; a bachelor of arts degree in economics from Cornell University; and one year of postgraduate study in engineering at Purdue University.

Gaylord further testified that he was referred to Stewart Dixon in 1989 by a circuit court judge. Gaylord's primary legal concerns at that time were an update of his will and estate planning. Gaylord also informed Dixon that he was presently experiencing marital discord and asked Dixon for advice regarding a potential divorce. Gaylord testified that he had only one conversation with Dixon regarding attorney fees and costs, although he could not recall whether this discussion was at his initial meeting in 1989 or at a later meeting in July 1991. Dixon advised Gaylord that his hourly rate for legal services was $225. Dixon also explained to Gaylord that the cost of representation "depends on how much we do and how long it takes." Gaylord testified that Dixon further stated, "I would estimate it would not run over $2,500."

Gaylord testified that his involvement with attorneys, prior to Wildman, included a lawsuit regarding a failed travel agency in which he was represented by three attorneys from Rockford, Illinois. Gaylord stated that the travel agency lawsuit was instituted in 1980 and was disposed of by the appellate court in 1990. Over the course of his 10-year representation by Rockford attorneys, Gaylord was billed at hourly rates ranging from $85 to $125 per hour. Gaylord testified that his total fees were $45,000 to one Rockford attorney and about $25,000 or $30,000 to another. Gaylord consulted with McDermott, Will & Emery attorneys regarding the travel agency matter but never retained their services.

In July 1991, Gaylord contacted Stewart Dixon to arrange a meeting to discuss Gaylord's will, which had not been updated since 1965. At his first meeting with Dixon in 1991, Gaylord recalled discussing the amount of his estate, the effect Robelm had on his estate, and his

interest in a family trust agreement. In response to the trial judge's inquiry about his representation agreement with Wildman, Gaylord testified:

> "I think I was very naive in not asking specifically how much each person was going to charge and how much he estimated the cost was going to run and to keep me abreast of it. I just sort of went along with it because I guess I went on faith. I wasn't very smart."

Gaylord acknowledged that he actively participated in Wildman's representation by attending several meetings and discussing alternate plans with Wildman attorneys. However, Gaylord maintained that his discussions with Wildman attorneys were limited to his estate plan and how his holdings would affect the form of his will.

On July 28, 1991, Gaylord attended his third meeting with Wildman attorneys. Gaylord testified that at this meeting he realized Wildman's representation was going beyond the scope of his initial intention, which was only to revise his will. Gaylord testified that he did not advise Wildman to terminate the representation at this point but that he knew he was in "deep trouble." Gaylord agreed with the trial judge's assessment that "deep trouble" meant that he thought his legal bills were getting "bigger than they ought to be."

On September, 17, 1991, Gaylord attended a final meeting with seven attorneys at the Wildman firm. Gaylord testified that, although he had been advised that litigation was an option, this meeting was the first time he became aware that Wildman had drafted a complaint. At the close of the meeting, Gaylord informed Wildman attorneys that he needed to think about whether he would file a lawsuit and discuss these issues alone with his wife. Later, Gaylord stated that this was actually a "stalling tactic." When asked why he was using "stalling tactics," Gaylord responded:

> "Because we had made up our mind we weren't going to go through with any legal action, and we were trying to figure out how we could worm our way out of this situation that had already gotten—the snowball had gotten so big; it had gotten out of hand."

Gaylord further testified that in October 1991, Dixon called him to find out how he wanted to proceed with his legal options. Gaylord told Dixon for the first time that he was "not going to go through with any legal action." Gaylord also informed Dixon that he thought the $58,000 bill for legal services he received from Wildman was "grossly overstated." Subsequently, Gaylord corresponded with Wildman's accounting department several times in order to get a reasonable explanation for the attorney fees charged to his account. Gaylord testified that he finally refused to pay the bill because he felt Wildman's

assertion that "the bill was legitimate" was an unsatisfactory explanation.

After hearing the testimony of the witnesses and considering all the evidence presented, the trial judge found that Gaylord was both "a brilliant man" and "of great wealth." The trial judge stated that it would have been "poor practice" for the attorneys handling Gaylord's estate planning to have failed to consider the tax consequences implicated and that this case did not involve "a simple drawing of a will."

The trial judge further determined that there was no meeting of the minds regarding the scope of Gaylord's representation as it related to the potential litigation. In ruling, the trial judge emphasized that Gaylord made it clear that he did not want to proceed with litigation under any circumstances. However, the trial judge also made a specific finding that Gaylord "consented to everything else" that was handled and prepared by the Wildman firm. Accordingly, the trial judge struck only those portions of the attorney fees that he determined, based on his 35 years of practice, were solely related to litigation.

The trial judge acknowledged the difficulty in separating out the litigation-related fees in light of the fact that plaintiff's billing statement only gave aggregate totals for all tasks performed in a given day. However, in his ruling the trial judge stated that he erred on the side of defendant and did not award the attorney fees where he was unable to "separate out the detail."

The trial court's conclusions regarding the amount of time Wildman expended on unauthorized litigation versus other legitimate tasks and the necessity and reasonableness of the legal services rendered are factual determinations. *Laff*, 63 Ill. App. 3d at 308; *Slater*, 56 Ill. App. 3d at 642. As previously noted, it is the function of the trier of fact, be it judge or jury, to weigh contradictory evidence, judge the credibility of the witnesses, and draw ultimate conclusions as to the facts of a case. *Sokol*, 81 Ill. App. 2d at 64; *Sullivan*, 58 Ill. App. 2d at 44; *Slater*, 56 Ill. App. 3d at 643; *Laff*, 63 Ill. App. 3d at 306-10. The trial court's consideration of conflicting witness testimony and detailed review of Wildman's billing statement resulted in an award to plaintiffs of $43,316 in attorney fees and $529 in costs. We find that there is ample evidence in the record to support the trial court's award.

## V. CONCLUSION

For the foregoing reasons, we affirm the circuit court of Cook

County's judgment in favor of plaintiff Wildman, Harrold, Allen & Dixon.

Affirmed.

McNULTY, P.J., and O'MARA FROSSARD, J., concur.