NOTICE

Decision filed 06/23/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190485-U

NO. 5-19-0485

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| KORY M. HEBERER and SARAH HEBERER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioners-Appellees, | ) | Saline County. |
| | ) | |
| v. | ) | No. 18-AD-18 |
| | ) | |
| JAMES SEETS, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court.
Presiding Justice Welch and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Judgment terminating respondent's parental rights and granting petitioners' petition for adoption affirmed where circuit court's findings regarding the respondent's unfitness and the child's best interest were not against the manifest weight of the evidence.

¶ 2    The respondent, James Seets, appeals the May 16, 2019, and October 21, 2019, orders of the circuit court of Saline County that found him unfit as a parent and found it in the best interest of his child, R.N.S., to terminate his parental rights and grant the petition for adoption in favor of the petitioners, Kory M. Heberer and Sarah Heberer.  For the following reasons, we affirm.

1

¶ 3                              BACKGROUND

¶ 4     At the outset, we note that this is an expedited appeal, pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). The deadline for the filing of this disposition was April 16, 2020. However, the deadline was not met for good cause. The respondent filed multiple motions for extensions of time to file his appellant brief, which were granted. These delays, each of which were attributable to the respondent, resulted in the case not being placed on the docket until July 2020. Accordingly, the disposition was filed as soon as possible after it was docketed.

¶ 5     On June 26, 2018, the petitioners filed a petition for adoption. The petition alleged that Sarah is the biological mother of R.N.S. and Kory is the stepfather of R.N.S. and has been raising her as his own child for the last four years. The petition further alleged that the respondent is the biological father of R.N.S. and is unfit because he had no contact with R.N.S. for four years. Accordingly, the petition requested the circuit court to terminate the respondent's parental rights and to grant the petition for adoption.

¶ 6     A fitness hearing was conducted on April 26, 2019. There, Sarah testified that she and the respondent have a daughter together, R.N.S., who was born on February 5, 2010, and who has resided with Sarah since her birth. Sarah testified that she married Kory on June 7, 2016, and that they reside together with R.N.S., their son, and Kory's daughter who visits every other weekend. Sarah confirmed that the respondent has had little to no contact with R.N.S. for the last four years.

¶ 7     Sarah testified that when her relationship with the respondent ended in late 2011 the respondent was given the opportunity to visit with R.N.S. every other weekend. Sarah

2

recalled that the respondent would occasionally ask to see R.N.S. through the week during that time and she would allow it. She testified that she never prevented the respondent from seeing R.N.S. and she allowed visits anytime he asked. Sarah explained that the respondent occasionally called to request visitation but most of the time she initiated the calls to ask the respondent if he would like to exercise the visits. Sarah reported that the respondent "would say no on a regular basis." Sarah clarified that R.N.S. left her care every other weekend, but R.N.S. was with the respondent's mother, Sindy, most of the time. Sarah explained that the respondent lived with Sindy at that time and he was often absent when she picked R.N.S. up from Sindy's house after the visits.

¶ 8 Sarah testified that as time progressed after 2011, she would prepare R.N.S. for visits but the respondent would not show up. Sarah testified that she and the respondent agreed that she would bring R.N.S. to him for Christmas 2011. When she arrived, however, the respondent was drunk, so she did not leave R.N.S. with him. Sarah indicated that the respondent's visits with R.N.S. decreased after Christmas 2011. She explained that she would call him to ask if he wanted to see R.N.S. but "it would most likely be he had plans." Accordingly, Sindy ended up caring for R.N.S. on those occasions.

¶ 9 Sarah testified that she felt like she was pushing the respondent to be a parent because she was required to call him to exercise visits. Sarah added that R.N.S. would cry because she wanted to see the respondent. Accordingly, Sarah would call the respondent to inform him that R.N.S. wanted to see him. Sarah reported that it was never the other way around with the respondent calling her to request visits with R.N.S. Although Sarah

3

had a car and the respondent did not, Sarah testified that she had no problem transporting R.N.S. for visits if the respondent called.

¶ 10    Sarah testified that an incident occurred in January 2014 that resulted in an emergency order of protection against the respondent.  However, Sarah did not include R.N.S. in the order of protection.  Accordingly, the respondent still had the opportunity to see R.N.S. every other weekend at Sindy's house.  However, Sarah reported that most of the time the respondent "was either out partying or not there," so Sindy had more of a relationship with R.N.S. than the respondent did.  Sarah added that, at that time, she was contacting Sindy about the visits instead of the respondent.  She explained that she sometimes attempted to contact the respondent, but he had no phone, so she was required to go through Sindy to effectuate the visits.

¶ 11    Sarah testified that in November 2014, she took R.N.S. to the doctor due to allegations of sexual abuse against R.N.S. by a six- or seven-year-old male child who also resided at Sindy's residence.  Sarah spoke with Sindy about the incident and learned that Sindy knew about it but had not informed Sarah about it.  After the doctor's appointment Sarah filed a report with the Saline County Sheriff's Department, and the Illinois State Police conducted an investigation.

¶ 12    Sarah believed that the respondent's residence was an unsafe environment because of the incident, but she did not want to keep R.N.S. from seeing her dad.  Accordingly, she offered the respondent supervised visits with R.N.S. at McDonald's.  Sarah reported, however, that the respondent never visited R.N.S. per those arrangements nor did he contact Sarah to see R.N.S.  Sarah testified that the respondent contacted R.N.S. at one

4

point and told her that he would see her and bring Christmas gifts to her, but Sarah "never heard from him again."

¶ 13 Sarah testified that the respondent never saw R.N.S. after November 2014 except when he showed up at her school to give her birthday presents. Sarah added that she allowed the respondent to come to her mother's house in February 2015 to give R.N.S. a birthday gift. She reported that he stayed for 30 minutes and incessantly asked to take R.N.S. with him, but when Sarah refused to allow that, he became angry and loud, so Sarah's mother asked him to leave.

¶ 14 Sarah emphasized that the supervised visits were still offered, but the respondent refused. She stated that she did not prevent the respondent from seeing R.N.S., did not litigate the matter, and always made R.N.S. available in the supervised context after the November 2014 incident. She explained that the respondent "didn't see anything wrong with what had happened when [R.N.S.] was in his care" and he wanted the visits to be unsupervised. However, Sarah was no longer comfortable with unsupervised visits and the visits essentially stopped at that point.

¶ 15 Sarah testified that R.N.S. was five years old in 2015, was in school, and participated in school functions. However, the respondent was never present at any of those. Sarah's last recollection of the respondent seeing R.N.S. was the one or two times near R.N.S.'s birthday in February 2015. Sarah could not recall a time in 2016 when the respondent saw R.N.S., nor did the respondent ever contact her in 2016 requesting to see R.N.S. Sarah denied that she blocked the respondent's phone number, although she admittedly blocked him on Facebook because he was sending her harassing messages. She added that she did

5

not avoid answering the phone when the respondent called. She testified that the respondent texted Kory in 2017 and "asked him if he would tell his daughter happy birthday and that he hoped she had a great day." Sarah agreed that the lines of communication were always open, and the respondent was always free to contact her to see R.N.S. but she never heard from him. She further indicated that the respondent did not provide financially for R.N.S., besides "20 bucks here and there."

¶ 16 Sarah testified further that the respondent had not contacted her or asked to see R.N.S. since the adoption petition was filed on June 26, 2018. She indicated that she crossed paths with the respondent at a retail store in October 2018, but he walked past her without asking how R.N.S. was doing or if he could see her. Sarah reiterated that nothing prevented the respondent from contacting her if he wished. She indicated that a couple of weeks before the fitness hearing, R.N.S. spent time with the respondent's brother and sister-in-law at their home, but the respondent neither saw nor contacted R.N.S. during that time.

¶ 17 The respondent testified that he and Sarah are the parents of R.N.S. He reported that he spends approximately $50 per month on alcohol and marijuana. He denied providing any financial support for R.N.S., claiming that he had no way of reaching Sarah. The respondent testified that Sarah stopped allowing him to contact her and he did not know where she lived until he received the adoption petition in the instant case. He testified that he did not file a family case because he could not afford an attorney. The respondent denied fault for not seeing R.N.S. and indicated that he had been unable to see R.N.S. in the past three or four years "because [Sarah] denied my every effort to try."

6

¶ 18 The respondent testified that he attempted to call Sarah from 2014 to 2016 and the number was blocked, hence the reason he texted Kory's phone to wish R.N.S. a happy birthday in 2017. The respondent further testified that "from 2014 to 2016 if [Sarah] did answer and the number wasn't blocked, she would get really nasty" and tell him that he was not R.N.S.'s dad anymore. He testified that Sarah stated that he may as well give up his rights and that she would not allow him to see R.N.S. no matter what he did. Accordingly, the respondent "got to the point where I did stop calling because of what she said" and "because I was afraid it was hurting my daughter and it was putting me under a lot of stress and it was driving me crazy at the time."

¶ 19 The respondent testified that he had seen R.N.S. "a few times, a couple of times [Sarah] didn't know about." He stated that he saw R.N.S. about 20 times in the last two or three years and Sarah had not allowed him to contact R.N.S. since he took birthday presents to R.N.S.'s school. The respondent reiterated that he had no money for an attorney and "I didn't know what else to do to be able to see my daughter." The respondent testified on cross-examination that the last time he saw R.N.S. was around Christmas 2016. He explained that he could not afford an attorney because he was providing support to Sarah until 2015 and "I was the main provider for my daughter." He testified that "I couldn't keep a job" so "the past two or three years I haven't had much effort in paying."

¶ 20 Nisinda Seets (Sindy) testified that she is the respondent's mother and the respondent currently lives with her. She stated that the respondent was devoted to R.N.S. and "that was his world." Sindy confirmed that Sarah and the respondent separated at the end of 2011 and the respondent moved in with her at that time because he was fired from

his job. Sindy explained that Sarah and the respondent lived in an apartment until they separated. Sindy testified that Sarah left R.N.S. with the respondent for two weeks and the respondent lost his job because he missed work to care for R.N.S.

¶ 21 Sindy testified that R.N.S. began visiting at her home in 2012 and continued doing so until 2014, when Sarah stopped answering the respondent's phone calls and refused to allow R.N.S. to come visit. Sindy indicated that she drove the respondent to R.N.S.'s school in 2015 so he could give R.N.S. her birthday presents. Sindy noted that the respondent "spent maybe 20 minutes with her at the most," giving her the birthday presents and talking to her. Sindy could not recall the respondent seeing R.N.S. after that day.

¶ 22 Sindy confirmed that Sarah's offer for supervised visits occurred from 2015 to 2016. She stated that "I don't understand that because my son never done [*sic*] anything to his daughter." Sindy indicated that no supervised visits ever occurred. She stated that the respondent attempted to contact Sarah, but she would either not answer, argue with the respondent if she did answer, hang up, or block the phone numbers. Sindy testified that the respondent tried to contact Sarah in 2016 and "he even went as far as talking to her mother trying to get messages to her to see his daughter."

¶ 23 Elizabeth Reeder testified that she is the respondent's sister. Elizabeth confirmed that there were "many times" Sarah attempted to prevent visits between the respondent and R.N.S. Elizabeth recalled times in 2013 when she was at Sindy's house visiting and witnessed the respondent attempt to call Sarah and the number would be blocked. She witnessed other times when the respondent and Sarah would argue over the phone.

8

¶ 24 Elizabeth testified that the respondent visited with R.N.S. frequently from 2014 until 2015, when the respondent was unable to see R.N.S. as much. Elizabeth indicated that the respondent still tried to see R.N.S. "all the time" by attempting to call Sarah from multiple phones, but if Sarah answered "she would scream at him and yell at him and hang up or she would just block the number and he wouldn't be able to call her again off that phone." Elizabeth was aware that Sarah offered supervised visits, but she was unaware if those visits ever occurred.

¶ 25 The circuit court took the matter under advisement and on May 16, 2019, entered an order finding the respondent unfit, pursuant to sections 1(D)(b), (c), (*l*), (n), and (o) of the Adoption Act (750 ILCS 50/1(D)(b), (c), (*l*), (n), (o) (West 2018)).

¶ 26 On October 17, 2019, a best interest hearing was conducted. There, Sarah testified that R.N.S. was currently nine years old and resided with her, Kory, R.N.S.'s brother, and occasionally R.N.S.'s sister. Sarah agreed that R.N.S. had a close bond with her siblings and loved spending time with them. Sarah testified that she and Kory had been married for three years and he had been a father figure to R.N.S. for five years. She indicated that Kory had financially supported R.N.S. since residing with her and he had both the willingness and the means to continue supporting her. She testified that R.N.S. saw Kory as her dad and had a strong bond with him.

¶ 27 Sarah reported that R.N.S. was thriving in her current environment and that she and Kory were both involved in R.N.S.'s school activities such as soccer, softball, and school programs. Sarah agreed that she and Kory wished the circuit court to change R.N.S.'s last name to Heberer and to grant the adoption petition to make Kory her father. On

9

cross-examination, Sarah admitted that she and Kory had a two-week separation due to a disagreement over Kory's daughter. Sarah indicated that she and R.N.S. stayed with her mother during that time, but Kory saw R.N.S. every day. Sarah reported that the disagreement was since resolved and she did not anticipate any future problems.

¶ 28 Kory took the stand and corroborated Sarah's testimony. He reported that R.N.S. "looks up to me like I'm her father." He agreed that if the circuit court granted the adoption petition, he would be R.N.S.'s father, no matter what. He further agreed that he would be financially responsible for R.N.S., and when asked if he would still be R.N.S.'s father even if he and Sarah divorced, he replied, "Absolutely." Kory opined that it was not in R.N.S.'s best interest to have a relationship with the respondent. He denied that R.N.S. had a desire for a relationship with the respondent. He further denied witnessing the respondent calm R.N.S. who was crying when Kory and Sarah picked her up from a visit with the respondent.

¶ 29 The circuit court questioned Kory about his separation with Sarah. Kory testified that they separated on September 17—one month prior to the best interest hearing. He agreed that they were separated for two weeks, that Sarah stayed with her mother during that time, that she took the children with her, and that he saw R.N.S. every day during the separation. He testified that he and Sarah separated on the day of a court proceeding involving his daughter because they had a disagreement, both were angry, and Kory advised Sarah to cool down. Kory denied that they had ever separated before and confirmed that they had been married for three years. Kory agreed that it would have been

10

better had Sarah stayed and worked through their differences rather than moving the children from their home.

¶ 30    Kory indicated that, besides the two-week separation during the marriage, he and Sarah lived together for two years before marrying and had a two-week separation during that time also. Kory reiterated that he and Sarah had resolved the latest disagreement, denied that there was any domestic violence in the home, and noted that he did not foresee another separation in the future. He described his relationship with Sarah as "good and healthy."

¶ 31    Allen Roe testified that he is the guardian *ad litem* (GAL) in the case. He indicated that R.N.S. saw Kory as her father and that she had not had much of a relationship with the respondent. He observed that a parent-child relationship formed between Kory and R.N.S. because Kory had been there to take up the slack created by the respondent in R.N.S.'s life. The GAL opined that granting the petition for adoption was in R.N.S.'s best interest.

¶ 32    The respondent testified that he believed it was in R.N.S.'s best interest for him to remain her father and "have a relationship like we used to." He indicated that he and R.N.S. were "inseparable" until 2015 when he and Sarah began having problems. The respondent testified that if the circuit court were to deny the petition for adoption, he would be more involved in R.N.S.'s life by taking her to "do stuff like we used to do, be at her school functions and anything I can do to be in her life like I used to be." The respondent agreed that he filed a petition to establish paternity in which he requested the circuit court to establish child support and parenting time, but the petition was dismissed. He had since filed a motion to reinstate the petition.

11

¶ 33    Isaac Barker testified that R.N.S. was his niece and the respondent was his brother. Isaac recalled seeing the respondent with R.N.S. from 2014 to 2015 "maybe once a week on the weekends." He opined that R.N.S. and the respondent had a great relationship. Isaac recalled no issues and R.N.S. always seemed happy when she was with the respondent. Isaac believed the respondent was a good dad to R.N.S. Isaac testified that Sindy is his mother and R.N.S. also had a good relationship with her. He reported that every time he saw Sindy and R.N.S. together, R.N.S. was happy and he never witnessed any problems.

¶ 34    Isaac agreed that R.N.S. spent the night at his home before the fitness hearing in the instant case. He indicated that when Sarah brought R.N.S. to the house, she asked him to call her if the respondent or Sindy showed up. Isaac agreed to do so because he was under the impression at the time that the respondent was not allowed to see R.N.S. Isaac could not recall whether he saw R.N.S. and the respondent together after 2015, and he opined that granting the adoption petition would be a bad idea because R.N.S. and the respondent always had a great relationship and "no father who is trying to see his kid should be not allowed to."

¶ 35    Angela Barker (Angie) testified that she and Isaac are married. She described the respondent's relationship with R.N.S. as "a very close father and daughter bond" and indicated that they were very loving and caring toward each other. Angie testified that, around the time of the fitness hearing in the instant case, she became aware that R.N.S. had a medical emergency requiring surgery. Angie learned that the respondent was not informed about the situation and "he was horribly upset" and wanted to contact Sarah to find out what was going on. Angie testified that the respondent could not get any

12

information from Sarah and that Sarah sent her a text message indicating that it was not the respondent's concern because he was not R.N.S.'s father. Angie opined that it would not be in R.N.S.'s best interest for the adoption to be granted and that R.N.S. should have a relationship with the respondent because "he is a very loving, caring father."

¶ 36 Sindy testified that R.N.S. and the respondent had a very good relationship and that R.N.S. "always wanted to be with him." She noted that the respondent played with R.N.S. all the time, that he did anything he could for her, and that you could not ask for a better dad. Sindy further testified that R.N.S. had a good relationship with the extended family and that "she loved being around everybody." Sindy noted that she had been around R.N.S. since the day she was born and that she always took care of her when the respondent worked. She stated that R.N.S. missed her cousins and the rest of her family. Sindy opined that it would be in R.N.S.'s best interest to continue having a relationship with the respondent.

¶ 37 At the conclusion of the hearing, the circuit court granted the petition for adoption and terminated the respondent's parental rights. A written order reflecting the judgment was entered on October 21, 2019. The respondent filed a timely notice of appeal.

¶ 38                                                    ANALYSIS

¶ 39 The respondent raises the following issues on appeal: (1) whether the circuit court erred in finding him unfit and (2) whether the circuit court erred in finding it in R.N.S.'s best interest to terminate his parental rights and grant the petition for adoption.

¶ 40 The Juvenile Court Act of 1987, as amended, provides a two-stage process whereby parental rights may be involuntarily terminated. 705 ILCS 405/2-29 (West 2018). Under

13

this bifurcated procedure, a threshold showing of parental unfitness must be made and based on clear and convincing evidence and, thereafter, a showing in a separate hearing that it is in the child's best interest to sever the parental rights. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990).

¶ 41                                    I.  Unfitness

¶ 42    The first issue on appeal is whether the circuit court erred by finding the respondent unfit.  " 'Because the trial court's opportunity to view and evaluate the parties and their testimony is superior to that of the reviewing court, a trial court's finding as to fitness is afforded great deference and will only be reversed on review where it is against the manifest weight of the evidence.' " *In re Shanna W.*, 343 Ill. App. 3d 1155, 1165 (2003) (quoting *In re Latifah P.*, 315 Ill. App. 3d 1122, 1128 (2000)).  " 'A decision regarding parental fitness is against the manifest weight of the evidence where the opposite result is clearly the proper result.' " *Id.* (quoting *In re Latifah P.*, 315 Ill. App. 3d at 1128).  The function of this court "is not to substitute our judgment for that of the trial court on questions regarding the evaluation of the witnesses' credibility and the inferences to be drawn from their testimony; the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses as they testify." *In re M.S.*, 302 Ill. App. 3d 998, 1002 (1999).  Moreover, we will not reverse the circuit court's decision if there is contradictory testimony from which different conclusions may be drawn unless an opposite conclusion is clearly apparent. *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 599 (2000).  Under this standard of review, we will affirm the circuit court's decision if there is any evidence in the record to support it. *Id.*

¶ 43    The grounds that support a finding of unfitness are set forth in section 1(D) of the Adoption Act (Act).  750 ILCS 50/1(D) (West 2018).  Although section 1(D) provides various grounds under which a parent may be deemed unfit, a finding of unfitness may be entered if there is sufficient evidence to satisfy any one statutory ground.  *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006).  "It is necessary that the State prove by clear and convincing evidence one statutory factor of unfitness for the termination of parental rights to ensue."  *In re M.S.*, 302 Ill. App. 3d at 1002.  "Therefore, this court need not consider other findings of unfitness where sufficient evidence exists to satisfy any one statutory ground."  *Id.*

¶ 44    Here, Sarah and Kory alleged in their adoption petition that the respondent was unfit because he had not had any contact with R.N.S. for four years.  The circuit court found evidence to support that allegation and in turn found five grounds of unfitness based on that evidence.  Again, we need only find evidence to support one of those grounds.  See *id.*

¶ 45    Section 1(D)(b) of the Act provides that one of the grounds for unfitness is "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare."  750 ILCS 50/1(D)(b) (West 2018).  The circuit court in this case found the respondent unfit based on this and four other grounds.  "In determining whether a parent has shown a reasonable degree of interest, concern or responsibility for a child's welfare, courts consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare."  *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006).

15

¶ 46 "Moreover, courts consider a parent's conduct in the context of the circumstances in which it occurs, including any difficulty in obtaining transportation to the child's residence, the parent's poverty, conduct of others that hinders visitation, and the motivation underlying the failure to visit." *Id*. "However, a parent need not be at fault to be unfit, and [he] is not fit merely because [he] had demonstrated some interest in or affection for [his] child." *Id.* "If personal visits were somehow impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and gifts to the child, taking into account the frequency and nature of those contacts." *Id*. "Courts will consider the parent's efforts which show interest in the child's well-being, regardless of whether those efforts were successful." *Id*.

¶ 47 Here, the respondent highlights the testimony of multiple witnesses that he attempted to visit with R.N.S. but Sarah prevented him from doing so. The respondent blames Sarah for his failure to see R.N.S. for three or four years and assumes no personal responsibility for this failure. We note the cited testimony, but further note evidence in the record that contradicts the respondent's claims on appeal. Again, it is not our duty, but that of the circuit court, to judge the credibility of witnesses and to resolve any conflicts in testimony. *In re M.S.*, 302 Ill. App. 3d at 1002; *Wildman*, 317 Ill. App. 3d at 599. Under the standard of review, our mission is to review the record, determine whether there is any evidence to support the circuit court's decision, and affirm the circuit court if any supporting evidence exists. *Wildman*, 317 Ill. App. 3d at 599.

¶ 48 Here, we find evidence in the record to support the circuit court's decision. Testimony revealed that when Sarah and the respondent separated at the end of 2011, the

16

respondent had sufficient opportunity to visit with R.N.S. every other weekend at Sindy's house where he resided. However, Sarah reported that the respondent often declined her offers for him to visit R.N.S., and when Sarah picked up R.N.S. from Sindy's home after the visits, the respondent was frequently absent. Sarah testified that she excluded R.N.S. from an order of protection against the respondent and he still had the opportunity to see her every other weekend at Sindy's house. Testimony showed that the respondent's visits with R.N.S. steadily declined and Sarah was eventually required to set up visits through Sindy rather than the respondent. Testimony further reflected that Sindy was R.N.S.'s caretaker during the visits more than the respondent.

¶ 49 Sarah testified that she had a car and the respondent did not, but transportation was never an issue because Sarah was always available and willing to transport R.N.S. for visits if the respondent asked to see her. Moreover, at the time, Sarah lived only 15 minutes from Sindy's home where the respondent resided. Accordingly, the record does not support any inference that transporting R.N.S. was impractical or inconvenient.

¶ 50 The record reflects that the dynamics of the visits changed after November 2014, when Sarah only offered supervised visits to the respondent due to allegations of sexual abuse perpetrated against R.N.S. by a male child who resided in Sindy's home. However, Sarah testified that the respondent opted out of the supervised visits because he did not want to visit R.N.S. in that context.

¶ 51 Witnesses testified that Sarah thwarted the respondent's efforts to contact her by blocking his number, while Sarah testified that she did not block the respondent's number and he always had access to contact her if he wished. While the respondent blames Sarah

17

for his failure to see R.N.S., the record shows that the respondent's efforts to see R.N.S. were less than stellar—even when R.N.S. was at Sindy's home every other weekend—and those efforts steadily declined as time passed. When R.N.S. enrolled in school she became involved in school activities, none of which the respondent attended. Although the respondent came to R.N.S.'s school on or around her birthday in February 2015 and brought her a birthday gift, we do not find this equates to a reasonable degree of interest, concern, or responsibility for R.N.S.'s welfare. See *In re Daphnie E.*, 368 Ill. App. 3d at 1064 (parent is not deemed fit just because he shows some interest in or affection for his child). The same holds true regarding the respondent's text message to Kory in 2017 to wish R.N.S. a happy birthday.

¶ 52    We find it significant that the respondent did not exercise the option to petition the circuit court for parenting time. He alleged that he did not do so because he could not afford an attorney, yet he admitted to spending $50 per month on alcohol and marijuana. The respondent's priorities were exemplified by spending choices and behavior that had nothing to do with his relationship with R.N.S.

¶ 53    We find ample evidence in the record to support the circuit court's finding that the respondent is unfit for his failure to maintain a reasonable degree of interest, concern, or responsibility as to the R.N.S.'s welfare. See 750 ILCS 50/1(D)(b) (West 2018). The respondent's efforts to visit and maintain contact with R.N.S. were slim to none, and we refuse to assign blame to Sarah for the respondent's own behavior and choices. See *In re Daphnie E.*, 368 Ill. App. 3d at 1064. The respondent did not choose to pursue visits with R.N.S. and the blame lies with him. He testified that he had not seen R.N.S. since

18

Christmas 2016 and he stopped calling "because of what was said" and "because I was afraid it was hurting my daughter and it was putting me under a lot of stress and it was driving me crazy at the time." This testimony suggests that the respondent simply did not want to be burdened with any inconveniences associated with pursuing and maintaining visits with R.N.S. Even if Sarah were uncooperative, the respondent was never without options. However, he simply chose not to exercise any available options to prioritize a relationship with R.N.S.

¶ 54 Because evidence in the record supports the circuit court's decision and an opposite conclusion is not clearly apparent, we find the circuit court's order finding the respondent unfit for failure to maintain a reasonable degree of interest, concern, or responsibility for R.N.S.'s welfare was not against the manifest weight of the evidence. See *In re Shanna W.*, 343 Ill. App. 3d at 1165; *Wildman*, 317 Ill. App. 3d at 599.

¶ 55                                    II.  Best Interest

¶ 56 The second issue on appeal is whether the circuit court erred in finding it in R.N.S.'s best interest to terminate the respondent's parental rights and grant the petition for adoption. "Once the circuit court has found by clear and convincing evidence that a parent is unfit ***, the *** interest in protecting the child is sufficiently compelling to allow a hearing to determine whether the termination of parental rights is in the best interest[ ] of the child." *In re D.M.*, 336 Ill. App. 3d 766, 771 (2002). "[D]uring a [best-interest] hearing, the court focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional atmosphere." *Id.* at 772. The standard of review for the circuit court's best-interest determination is whether the finding is against

the manifest weight of the evidence. See *In re B.R.*, 282 Ill. App. 3d 665, 670 (1996). Section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)) contains the factors to be considered by the court in a best-interest proceeding according to the age and developmental needs of the child.

¶ 57    Here, the evidence supports the circuit court's determination that it was in R.N.S.'s best interest to terminate the respondent's parental rights. Testimony showed that Kory had financially supported R.N.S. for five years and that R.N.S. was thriving in her current environment (*id.* § 1-3(4.05)(a)). Moreover, Kory had been a father figure to R.N.S. for five years, R.N.S. saw Kory as her dad, and she was closely bonded with him (*id.* § 1-3(4.05)(b)). Although R.N.S. had a background with the respondent and Sindy, that background was remote, there is no evidence that the respondent exercised visits with R.N.S. after November 2014, and the respondent testified that he had not seen her at all since December 2016 (*id.* § 1-3(4.05)(c)). Indeed, R.N.S.'s familial background with Sarah and Kory was both current and stable (*id.*).

¶ 58    Evidence showed that R.N.S. was attached to Kory and had a close bond with her siblings and loved spending time with them (*id.* § 1-3(4.05)(d)(i)-(v), (g)). Although the respondent and his family all testified that R.N.S. was closely bonded to the respondent and had a good relationship with him, his lack of contact with R.N.S. over the years necessarily resulted in R.N.S. having closer bonds and a greater sense of family, attachment, acceptance, and belonging in Kory and Sarah's home (*id.*).

¶ 59    While there was testimony that Kory and Sarah separated for two weeks just prior to the fitness hearing, the circuit court carefully questioned Kory to ensure the dispute was

20

resolved and there was no risk of repeated separations. The circuit court admonished Sarah and advised her to improve her conflict resolution skills. At the same time, the circuit court commended Kory and Sarah for their efforts during the separation to ensure that R.N.S. saw Kory every day during that time (*id.* § 1-3(4.05)(d)(v), (g)). The record further shows that R.N.S. had community ties through her school and was involved in school activities such as soccer, softball, and school programs which Sarah and Kory both attended (*id.* § 1-3(4.05)(f)).

¶ 60    In conclusion, the circuit court observed that whatever former relationship the respondent had with R.N.S. was superseded by R.N.S.'s best interest and her need for a stable, loving home. The circuit court found that Kory and Sarah's home was a place where R.N.S. would be loved and taken care of. We agree. Because an opposite conclusion was not clearly apparent, we find the circuit court's finding it in R.N.S.'s best interest to terminate the respondent's parental rights and to grant the adoption petition was not against the manifest weight of the evidence. See *In re Shanna W.*, 343 Ill. App. 3d at 1165; *Wildman*, 317 Ill. App. 3d at 599.

¶ 61                             CONCLUSION

¶ 62    For the foregoing reasons, we affirm the May 16, 2019, and October 21, 2019, orders of the circuit court of Saline County.

¶ 63    Affirmed.