**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 180083-U

Order filed December 3, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| In re Estate of BETTY BUECKER, Deceased, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois. |
| (Sharon K. Morrison and James William Buecker, Co-Executors, | ) ) ) | |
| Plaintiffs and Counterdefendants-Appellants, | ) ) ) | Appeal No. 3-18-0083 Circuit No. 15-LM-407 |
| v. | ) ) | |
| BETTERWAY SIDING & WINDOWS, INC. and DAVID SMITH, | ) ) ) | |
| Defendants and Counterplaintiffs-Appellees). | ) ) ) | Honorable Michael D. Risinger, Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court.
Presiding Justice Schmidt and Justice Carter concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: Trial court (1) did not abuse its discretion in making evidentiary rulings, (2) did not err in excluding plaintiff's proposed jury instructions, (3) did not abuse its discretion in denying plaintiff's motion to deem facts admitted, (4) did not err in denying relief on plaintiff's consumer fraud claims, and (5) did not err in refusing to enter a remittitur where the jury's award was supported by the record.

¶ 2     Betty Buecker filed suit against defendants, Betterway Siding and Windows, Inc. and David Smith, claiming that defendants refused to complete the installation of a metal roof pursuant to contract. Defendants disputed Buecker's claim that they refused to complete the job and filed a countercomplaint, alleging breach of contract, unjust enrichment, and *quantum meruit*. Following a jury trial, judgment was entered in favor of defendants and against plaintiff in the amount of $50,000 for liquidated damages and attorney fees. We affirm.

¶ 3     On September 22, 2014, Buecker entered into a contract with Betterway, a home repair company owned and operated by Smith, to install a metal roof on her house. The contract provided that the roof would be installed over the existing shingled roof for a bid price of $29,600. The terms and conditions of the contract included a provision for liquidated damages:

> "Liquidated Damages – Owner further agrees that, if the contract has not been canceled within 3 business days from the date of this contract, in the event he should attempt to repudiate the terms of this contract on account of the difficulty of ascertaining and estimating the amount of damages which shall be sustained by the contractor by reason thereof, the owner agrees to pay that 40% of the total amount of the indebtedness to become due and payable immediately from the owner to the contractor as liquidated damages ***. If the contract is for a special order where product has to be made to specification to fit the owners house ***, then 70% of total indebtedness to become due from the owner under the terms of this agreement shall become due and payable immediately from the other to the contractor as liquidated damages."

The contract also contained a clause for attorney fees:

2

"Attorney Fees – In the event that it is necessary for the contractor to bring suit to enforce this agreement or to collect damage for violations of any of the provisions of the same, then in said event the owner agrees to pay all costs of collection, including the contractor's reasonable attorney fees and court costs. Even if suit is not filed owner agrees to pay reasonable attorney fees and other costs of collection incurred by contractor for enforcement of this agreement."

When Buecker signed the agreement, she indicated that she wanted the roof completed by Thanksgiving. In acknowledgment of that conversation, the salesman wrote "if not done by Thanksgiving 10% off" at the top of the contract.

¶ 4      Betterway did not complete installation by Thanksgiving 2014. In March 2015, the crew manager fell off the roof and work stopped. In April, Buecker made a second payment of $10,000 on the contract at Betterway's request. By September, Betterway had not completed the project. Buecker's attorney sent a letter to Smith, asserting that Betterway had breached the contract by refusing to complete work, and demanded reimbursement of the $20,000 that Buecker had paid.

Betterway responded to Buecker's letter and disputed her claim that the company had refused to finish the job. Betterway stated that it was "ready, willing, and able to complete this project."

¶ 5      On October 22, 2015, Buecker filed an LM case against Betterway and Smith for alleged misrepresentations and improper installation of the metal roof. The complaint included causes of action for breach of contract, breach of implied warranty of workmanlike conduct, and common law fraud, as well as claims under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq*. (West 2016)). In her prayer for relief, Buecker requested damages, attorney fees, and costs, not to exceed $50,000. In response, defendants filed

3

a countercomplaint, asserting that Betterway was ready, willing, and able to complete the work and that Buecker breached the contract by refusing to let the company finish the job. They sought liquidated damages and attorney fees under the provisions of the contract.

¶ 6     During the next 18 months, the parties filed several amended pleadings, conducted extensive discovery and filed numerous pretrial motions. On March 31, 2017, Buecker filed an answer and affirmative defenses to defendants' second amended countercomplaint. Defendants did not file a response within 21 days. Buecker filed a motion to deem facts admitted based on defendants' failure to respond to her affirmative defenses. At a pretrial hearing, counsel for defendants noted that a late response to the affirmative defenses was filed on June 27, 2017. The trial court denied Buecker's motion and allowed defendants' belated response.

¶ 7     Prior to trial, Buecker filed a motion *in limine* arguing that defendants only disclosed four witnesses in their Rule 222 disclosures, not including Joe Don Behymer, and asked the court to bar Behymer's testimony. The trial court denied Buecker's motion but granted her additional time to depose Behymer. Buecker declined to depose him and instead proceeded to trial.

¶ 8     At the jury trial, Smith testified that he owns Betterway, a construction company that focuses on home repair and remodeling projects. The company is a member of the National Roofing Contractors Association and is certified to install metal corrugated roofing. His salesperson, Josh Banister, initially contacted Buecker. Banister went to Buecker's house on September 22, 2014 and quoted her a price of $29,600 to install a new metal roof. Buecker made a down payment of $10,000 when she signed the contract, and Banister noted a balance due upon completion of $19, 600.

¶ 9     Smith testified that Betterway employee Dave Fuertges, was the general manager assigned to Buecker's job. He contacted Joe Don Behymer and asked him to install the roof. Behymer was

4

the head of the first crew to work on Buecker's roof beginning in October 2014. In January 2015, Betterway replaced Behymer's crew with a crew headed by Lewis Lowrey. In March, Lowrey was attempting to cut a branch and fell off Buecker's roof. On April 21, 2015, Smith went to Buecker's house and she gave him a second check for $10,000 to cover the cost of materials. In September 2015, Smith received a letter from Buecker's attorney requesting that he return the $20,000 she had paid because the roof had not been completed.

¶ 10 Sharon Morrison testified that Buecker is her mother and that she and her husband, Arron, live with Buecker. Sharon is her sole caretaker and has medical and financial power of attorney. Sharon was with her mother when she signed the Betterway contract in September 2014. The salesman indicated that Betterway had the capability to install a metal roof and that the project would be done by Thanksgiving. Buecker signed the contract for a metal roof and gave him a check for $10,000. Sharon went to Betterway's office three times to complain about Behymer's crew because they frequently did not show up to work on the roof. Lowrey's crew was doing a good job, but the work stopped when Lowrey fell in March. In April, Smith and a man named Todd Pilcher came out to the house and collected another $10,000 payment. At that time, Sharon and her mother told Smith that they would wait for Lowrey to recover from his fall. They wanted Lowrey to finish the roof because they thought he was doing a good job. A few months later, Betterway sent two men out to inspect the roof. No one from Betterway returned to finish the roof.

¶ 11 Based on recommendations from other homeowners, Sharon contacted Tim Garrison, owner of River City Roofing, to see if he could finish the roof. Garrison came to the house on September 29, 2015, and she signed a contract on her mother's behalf to install a new metal roof for $34,000. The new roof was installed, and Buecker paid River City Roofing $34,000.

5

¶ 12        Lewis Lowrey testified that he was in the hospital for a week after he fell off Buecker's roof. Arron, Buecker's son-in-law, visited him at the hospital and said that he hoped Lowrey could finish the job. In July, three months after his injury, Lowrey returned to finish the job, but after three days, his hip started to bother him. In addition, Arron was hovering around his workers and walking on the roof. According to Lowrey, Arron was "a little obnoxious" and "was getting a little irate" about things Lowrey's crew had not finished yet. Lowrey called Fuertges and told him that he was not going to do the job if Arron was going to be on the job everyday walking on the roof and creating more problems. Lowrey and his crew stopped working on Buecker's roof on the third day and did not return.

¶ 13        Lowrey estimated that approximately two-thirds of the front of the roof was done when he left. He had not even started on the back of the house. About one week later, Lowrey received a call from Smith asking him to return to Buecker's residence and complete the roof. Smith told him that Buecker and Aaron did not want anybody but Lowrey working on the roof. Lowrey testified that he told both Smith and Arron that he could not return to work because he needed more time to heal. That was the last time he heard from Smith about the project.

¶ 14        Timothy Garrison testified as an expert for Buecker. He owns River City Roofing and has been in the commercial and residential roofing business for more than 15 years. He has installed 60 to 70 metal roofs. He evaluated the roof installed by Betterway and determined that there were enough problems with the screw holes, the screw pattern, and different components of the metal roof that it needed to be removed rather than repaired. He testified that if the old crew was still working on the roof, some of the issues could have been replaced or fixed. However, to provide a warranty, the metal that had already been screwed down had to be removed and a new metal roof had to be installed.

6

¶ 15     Arron Morrison testified that he has done sheet metal work in the heating and cooling industry for ten years. He was not present when Buecker and Sharon signed the contract with Betterway. He noticed that Behymer's crew was not doing the work correctly. He told them that they were not putting the screws in correctly, but they did not listen. Lowrey's crew took the whole front of the house off and replaced it. A month or so after Lowrey's accident, two men from Betterway came out and inspected the roof. Arron was mowing the lawn and only spoke to one of them for a few moments. A few weeks later, Arron went to Betterway to ask why no one had been to the house to finish the roof. He was "a little frustrated," and a Betterway employee escorted him outside to discuss the matter. Arron was unable to identify the employee or provide a name. When Arron asked the man if Betterway was going to finish the project, he responded, "We've absolved ourself [sic] of this job." He did not see anyone from Betterway on Buecker's property after that. On cross-examination, Arron admitted that he was on the roof while the crews were working and that he attempted to give them instructions.

¶ 16     William Harris is a certified roof consultant and a roof inspector. He inspected Buecker's roof after Lowrey's crew left. He observed several problems, including improperly installed leak prevention material around the skylights, unsecured ridge caps, unfinished fascia, missing transition pieces, improperly installed screws and fasteners, and missing screws. In some areas, he believed the work simply needed to be completed. In other areas, he opined that the panels needed to be replaced and reinstalled. He testified that the upper roof section could have been kept or salvaged. He also noted that an inexperienced person walking on the roof could do a lot of damage.

¶ 17     In Buecker's video deposition she stated that the salesman agreed that the roof would be installed by Thanksgiving. He told her that if it was not, she would get a discount, and he wrote

that on the contract. During the project, Arron communicated regularly with the workers and then back to her. After Lowrey fell off the roof, Smith asked for an additional payment of $10,000 to buy more materials. She and Smith talked about Lowrey and she told him that she would wait for Lowrey "because he had asked us to." No one from Betterway came back to complete the roof after Lowrey left the job the second time. On cross-examination, Buecker testified that Arron tried to help the workers on Betterway's crews by showing them how to bend and install the sheet metal.

¶ 18    Joe Don Behymer was the crew leader for the first crew that worked on Buecker's roof. He testified that he has been working in the construction industry for almost 25 years and has installed several metal roofs. Arron made it difficult for his crew to complete Buecker's roof. He hoovered over the workers, told them how to cut the metal, and yelled at them. When they refused to listen to him, he cursed at them and told them to get off his "f***ing" property. He said that the next morning, he returned to the job site and Arron said he was sorry about the day before and told his crew to finish their work. Behymer's crew finished their work that day and the next morning Fuertges informed him that the customer wanted a different crew to finish the job. Counsel's hearsay objections to Arron's comments were overruled.

¶ 19    Dave Fuertges testified that he assigned another crew to Buecker's project because Behymer and Arron "couldn't see eye to eye any more. Joe was feed up with Arron. Arron just wouldn't leave him alone." Initially, Arron got along with Lowrey's crew "really well." Lowrey had to order more panels to replace some of the panels from the first crew. Fuertges was going to send another crew out after Lowrey broke his hip, but Arron said that he liked Lowrey's crew and would wait for him to return to work. In the meantime, Fuertges ordered more materials and waited for Lowrey. Four months later, Lowrey returned to Buecker's project. Within a few days, Lowrey was complaining to Fuertges that Arron was difficult to work with and was always

8

complaining. On the third day, Lowrey informed Fuertges that he was not healed from his hip surgery and could not complete the job. Fuertges testified that he never told Buecker or Arron that Betterway would no longer work on Buecker's roof. The company always intended to complete the work under the contract. He had a third crew ready to go, but then he realized that there were issues and that an attorney was involved.

¶ 20     Smith's testimony on the countercomplaint was similar to his earlier testimony. He stated that after Lowrey fell, Buecker agreed that she would pay another $10,000 toward the total contract price of $29,600 to help cover the costs of materials and labor. Buecker wanted to wait for Lowrey, and Smith was going to have to wait five or six months for Lowrey to recover. He noted that steel roofing is considered a special order contract and that he had already spent $22,034 on the project. Buecker's second payment left $9,600 outstanding, but the 10% discount would apply because the roof was not finished by Thanksgiving. Smith's attorney sent a letter to Buecker letting her know that Betterway had not refused to complete the project and had, in fact, attempted to complete the job several times. He never told Buecker, Sharon or Arron that he was not ready, willing, and able to finish the job.

¶ 21     Smith identified Exhibit No. 5 as a group of pictures of Buecker's roof that he took on the day he and Fuertges inspected it after Lowrey's fall in 2015. He noted that the pictures were taken after Lowrey's crew left for the second time. He also identified Exhibit No. 10 as a collection of the invoices Betterway received for materials ordered for Buecker's project. It included invoices from Menards, a metal roofing manufacturer, and a local lumber yard. The exhibits were admitted over Buecker's objection. The record shows that these invoices were disclosed and used during Smith's deposition.

9

¶ 22        Finally, Smith testified that he had incurred more than $50,000 in attorney fees and costs to enforce the terms of the contract and collect damages for Buecker's contract violations. Exhibits were admitted showing invoices from Attorney Angela Evans for approximately $34,000 in services and Attorney James LeFante for $17,515 in services. Additional exhibits were admitted for deposition fees and costs.

¶ 23        During closing argument, defense counsel used a PowerPoint presentation. The slides contained pictures of each witness and a brief summation of their testimony.

¶ 24        Following closing arguments, the consumer fraud claims went to a bench trial. The trial court found that the counts based on the Consumer Fraud Act had not been proven by a preponderance of the evidence and entered judgment in favor of defendants.

¶ 25        The jury returned a verdict against Buecker and in favor of Betterway. The verdict forms contained several special interrogatories. In response to the special interrogatories, the jury found that (1) Buecker failed to prove that Betterway breached the contract by failing to finish installing the metal roof, (2) Betterway provide it had a valid excuse for not performing the contract, (3) Buecker breached the contract by refusing to allow Betterway to complete the work making Betterway's performance under the contract impossible, and (4) Buecker failed to prove her affirmative defenses. It calculated liquidated damages as $4,648 (remaining indebtedness under the contract times 70%) and awarded reasonable attorney fees in the amount of $55,396.05, for a total award of $60,044.05. After the jury read the verdict, the trial court entered a remittitur reducing the judgment to $50,000 pursuant to Supreme Court Rule 222(b) (eff. July 1, 2006).

¶ 26        Buecker filed a postjudgment motion asserting that the trial court made numerous evidentiary errors and erred in denying her consumer fraud claims. The motion also claimed that

an additional remittitur was required because the jury's verdict was erroneous and excessive. The trial court denied the motion, and the executors of Buecker's estate appeal. [1]

¶ 27                                    ANALYSIS

¶ 28                            I. Evidentiary Rulings

¶ 29        Plaintiffs contend the trial court abused its discretion and made several reversible errors regarding the admission of evidence before and during trial. They claim that the trial court erred in (1) allowing improperly disclosed witnesses to testify, (2) admitting improperly disclosed exhibits, (3) admitting improperly disclosed photographs, (4) overruling objections to hearsay statements during Behymer's testimony, (5) making inconsistent rulings regarding witness Todd Pilcher, and (6) excluding the testimony of witness Bryon Good.

¶ 30        Generally, evidentiary rulings are directed to the trial court's sound discretion and reviewing courts will not disturb a trial court's decision absent an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). The threshold for finding an abuse of discretion is high. *Enbridge Energy (Illinois), LLC v. Kuerth*, 2016 IL App (4th) 150519, ¶ 90. "A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable [person] would take the view adopted by the court." *In re Leona W.*, 228 Ill. 2d at 460.

¶ 31                                        A.

¶ 32        First, plaintiffs argue that Behymer was not properly disclosed as an intended witness under defendants' Supreme Court Rule 222 (eff. Jan. 1, 2011) disclosures and that both Behymer and Fuertges was not properly disclosed as opinion witnesses in response to Buecker's Supreme Court Rule 213(g) (eff. Jan. 1, 2007) interrogatories.

---

[1] Buecker passed away on April 16, 2018. Co-Executors of the estate, Sharon Morrison and James Buecker, have since been substituted as plaintiffs in this action to continue with the appeal.

¶ 33    The record shows that Buecker waived her objection to any failure to disclose Behymer. Trial counsel was given the opportunity to continue trial and depose Behymer but declined to do so. Instead, counsel withdrew his objection and proceeded to trial. Waiver aside, Buecker was aware that Behymer worked on the first crew that installed the metal roof almost a year before trial. Plaintiffs alleged that the first crew improperly installed the roof in their complaint, and both Smith and Fuertges named Behymer as the head of the first crew in their depositions in 2016. Thus, the trial court did not abuse its discretion by allowing Behymer to testify. See *Bloomquist v. Ely*, 247 Ill. App. 3d 656, 664-65 (1993) (trial court did not err in allowing testimony where, although not disclosed under discovery rule, the expert's opinions were disclosed in depositions and therefore there was no surprise).

¶ 34    Further, defendants' failure to disclose Fuertges and Behymer as opinion witnesses under Supreme Court Rule 213(g) (eff. Jan. 1, 2007) (requiring disclosure in written response to interrogatories) or Supreme Court Rule 222(d) (eff. Jan. 1, 2011) (requiring disclosure within 120 days of responsive pleading) does not require the trial court to bar their testimony where neither witness offered opinion testimony. See *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 12 (2007) (trial court did not abuse its discretion in permitting testimony of witnesses where testimony was lay testimony and did not constitute the basis of an expert opinion requiring disclosure). Fuertges was the general manager assigned to Buecker's project. His testimony was based on personal knowledge and observations. It was not offered as opinion testimony as to the quality of work on the roof. Similarly, Behymer testified that he worked on Buecker's home during the relevant time of the allegations in her complaint. His testimony was that of an occurrence witness who had first-hand knowledge of the relevant facts. We therefore conclude that the trial court did not abuse its discretion in allowing both witnesses to testify about their work on Buecker's roof.

¶ 35                                    B.

¶ 36          Next, plaintiffs contend that the trial court erred in admitting defendants' Exhibits No. 5 and No. 10 into evidence.

¶ 37          Exhibit No. 5 included several photographs of the metal roof as installed by Betterway after Lowrey's crew left the job. Smith testified that the photographs accurately depicted the roof on the day that Smith and Fuertges inspected it in the fall of 2015. He further testified that the pictures accurately depicted the front of the roof and the chimney area that had not been completed. On cross-examination, Smith agreed that his pictures did not show the "bad" parts of the roof or the parts that needed repair.

¶ 38          A proper foundation for the admission of a photograph is established when a witness identifies it as a correct representation of certain facts relevant to the issues in the case; the witness does not need to be the taker of the photograph or know of the time or condition of the taking. See *Lawson v. Belt Railway Co of Chicago*, 34 Ill. App. 3d 7, 21 (1975). In this case, the trial court admitted the pictures for the limited purpose of showing the portions of the roof that had been completed. Plaintiffs' argument that the photographs did not fully depict the problems with the roof goes to the weight of the evidence, not its admissibility. We find no abuse of discretion in the trial court's decision to admit Exhibit 5 for the purpose of showing the work Betterway had done.

¶ 39          At trial, Smith identified Exhibit No. 10 as a group of invoices for the Buecker project. He identified each bill in the exhibit and stated that they were for materials ordered for the roof. He testified that he received them and paid for them in the ordinary course of his business.

¶ 40          Supreme Court Rule 236(a) specifically states:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge of the entrant or maker, may be shown to affect its weight but shall not affect its admissibility." Ill. S. Ct. R. 236(a) (eff. Aug. 1, 1992).

After considering Smith's testimony, the trial court ruled that the invoices contained in the exhibit were kept in the regular course of business and were admissible even though they were prepared by someone else. The trial court correctly applied the criteria of Rule 236 when weighing the admissibility of the invoices and did not abuse its discretion in admitting the exhibit.

¶ 41                                                      C.

¶ 42        Plaintiffs also argue that PowerPoint slides containing the photographs of Sharon and Arron were improperly admitted as demonstrative evidence during closing arguments. They argue that the photographs were highly prejudicial because they were not flattering and left a negative impression on the jury.

¶ 43        The regulation of the substance and style of closing argument lies within the trial court's discretion. *Reed v. Ault*, 2012 IL App (2d) 110744, ¶ 34. The admission of demonstrative evidence also lies within the sound discretion of the trial court. *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 796 (2002). We do not believe the court's decision was an abuse of discretion. First, many of the cases cited by defendant involved the use of demonstrative exhibits during the

14

presentation of evidence, not during closing arguments. In this case, the presentation was used only in closing arguments and the photographs were not referenced. Therefore, any concern about undue emphasis or misleading interpretation of evidence as it is given was not present. Second, during closing arguments, counsel is allowed considerable latitude and has the right to comment on the evidence and draw all legitimate inferences. *Brown v. Moawad*, 211 Ill. App. 3d 516, 528 (1991). As such, the use of pictures or slides to illustrate a closing argument is proper as long as they are not misleading to the jury. See *Martin v. Zucker*, 133 Ill. App. 3d 982, 989 (1985) (use of exhibits is permissible if they are not misleading). Here, the pictures were not used to misconstrue the evidence presented at trial, and the court had broad discretion in regulating the manner of closing argument. Thus, the trial court did not abuse its discretion by allowing defense counsel to use the pictures in a PowerPoint presentation.

¶ 44                                                    D.

¶ 45            Plaintiffs' next evidentiary argument is that the court abused its discretion by allowing Behymer to testify about statements Arron made when his crew was working on Buecker's roof.

¶ 46            Hearsay evidence, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible unless an exception applies. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 351 (2010). However, where an out-of-court statement is offered for some other purpose, the statement is not hearsay and is admissible. *City of East Peoria v. Palmer*, 2012 IL App (3d) 110904, ¶ 50. "A statement that is offered to prove that a listener had notice of the information contained therein, rather than to prove the truth of the matter asserted, is not hearsay." *People v. Shoultz*, 289 Ill. App. 3d 392, 395-96 (1997).

¶ 47            In this case, Behymer testified that Arron cursed at his crew members and told one of his workers to get off his "f***ing" property. He also testified that the next day Arron said he was

15

sorry about the day before and told his crew to finish their work. The record demonstrates that these alleged hearsay statements were not offered for the truth of the matter asserted. Rather, they were offered to show that Arron continually interfered with the project. Since the testimony was not offered to prove the truth of the matter asserted, it did not fall within the definition of hearsay and was admissible. Thus, the court did not abuse its discretion in overruling Buecker's objection to Behymer's testimony.

¶ 48                                                    E.

¶ 49        Plaintiffs also argue that the trial court erred in barring evidence regarding Todd Pilcher and the testimony of homeowner Bryon Good.

¶ 50        At a motion *in limine* hearing, Buecker attempted to present a Peoria County summary judgment order, dated 2011, which stated that Pilcher owned and operated a home repair business in 2003 and committed fraud against numerous clients. Buecker argued that this evidence was probative because Pilcher accompanied Smith when he met with Buecker and requested a second payment. The trial court granted defendants' request to bar any evidence of Pilcher's prior bad acts, finding that it was more prejudicial than probative.[2]

¶ 51        Prior acts of fraud may be admissible to prove the alleged fraud when there is evidence that the other acts are part of the same scheme or plan or that they were committed in pursuit of a common purpose. *Brown v. Brown*, 62 Ill. App. 3d 328, 337 (1978). Illinois Rules of Evidence 402 and 403 (eff. Jan. 1, 2011) provide that all relevant evidence is admissible, unless its probative value is substantially outweighed by another factor, such as unfair prejudice. Ill. Rs. Evid. 402, 403 (eff. Jan 1, 2011). It is within the trial court's discretion to determine what evidence is relevant

---

[2] Although the trial court barred this evidence from the jury trial, the court considered the evidence as it related to Buecker's consumer fraud claims, which were severed and tried as a bench trial.

and admissible, and we will not reverse its determination unless it is an abuse of discretion. *Bachman*, 332 Ill. App. 3d at 797.

¶ 52    The trial court's decision was not an abuse of discretion. Evidence regarding the summary judgment entered against Pilcher in 2011 failed to establish that Pilcher committed a scheme or plan to commit fraud with Smith or Betterway in 2015. Neither Smith nor Betterway were mentioned in the judgment entered against Pilcher, and Pilcher was not named as a defendant in this case. Moreover, Pilcher was not a shareholder of Betterway, and he did not work on Buecker's project. Any discussion of the judgment entered against Pilcher would have imposed unfair prejudice in the jurors' minds, with no probative value. We therefore find no error in the trial court's decision.

¶ 53    Similarly, the trial court properly barred the testimony of Byron Good. Good was a homeowner who hired defendants to replace his roof. In an offer of proof, he stated that the metal roof defendants installed on his property had the same issues as Buecker's roof. After hearing arguments, the trial court found that Good's testimony would be "totally prejudicial." Again, we find that the trial court properly weighed the criteria under Rule 402. Good's proposed testimony did not relate to the quality of Betterway's work on Buecker's project. The trial court did not err in determining that Good's testimony was more prejudicial than probative and was not relevant to the issues submitted to the jury.

¶ 54                              II. Proposed Jury Instructions

¶ 55    Next, plaintiffs contend that the trial court erroneously excluded proposed jury instructions No. 5 and No. 6. They claim that the excluded instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles, and the jury was prejudiced "by not being presented with them."

17

¶ 56    The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence presented in the case. *Dillion v. Evanston Hospital*, 199 Ill. 2d 483, 507 (2002). A non-IPI instruction should be used only if the IPIs for criminal cases do not contain an accurate instruction and if the tendered non-IPI instruction is accurate, simple, brief, impartial, and free from argument. *Erickson v. Muskin Corp.,* 180 Ill. App. 3d 117, 127 (1989), *overruled on other grounds by Blagg v. Illinois FWD Truck & Equipment Co.*, 143 Ill. 2d 188, 201 (1991). Even if the general pattern instructions are inadequate, it does not necessarily follow that the trial court erred in refusing to accept a party's instructions. The test for determining whether jury instructions are proper is (1) whether they form a clear and adequate picture of the applicable law when viewed in their entirety and (2) whether they fully, fairly, and comprehensively inform a jury of the applicable legal principles without overly emphasizing a particular factor. *Schwartz v. Sears, Roebuck & Co.,* 264 Ill. App. 3d 254, 266 (1993). Whether to provide a particular jury instruction is within the discretion of the trial court. *Webber v. Wight & Co.,* 368 Ill. App. 3d 1007, 1020 (2006).

¶ 57    We find no abuse of discretion in the trial court's denial of non-IPI instructions No. 5 and No. 6. The jury instructions were agreed to after a lengthy conference where both parties and the trial court provided input, made revisions, and agreed on a set of instructions. A transcript of that conference was not available, and plaintiffs failed to provide a bystander's report or agreed statement of facts as to those proceedings. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (appellant must furnish a sufficient record to establish reversible error and any doubt arising from the incompleteness of the record will be resolved against the appellant). At the posttrial hearing, the trial court stated that the tendered instructions were carefully considered and the agreed upon instruction formed a clear picture of law and were free from argument. Although we are unable

18

to review the jury instruction conference, the record supports the court's statement. It shows that the instructions that were given fully, fairly and comprehensively informed the jury of the applicable legal principles. Based on the record before us, we cannot say that the trial court abused its discretion in refusing plaintiff's proposed non-IPI instructions No. 5 and No. 6.

¶ 58                                    III. Facts Admitted in Affirmative Defenses

¶ 59        Plaintiffs argue that the trial court should have granted Buecker's motion to deem facts admitted based on defendants' failure to respond to her affirmative defenses within 21 days, as required by section 2-602 of the Code of Civil Procedure (Code) (735 ILCS 5/2-602 (West 2018)) and Supreme Court Rule 182 (eff. Jan. 1, 1967).

¶ 60        Section 2-602 of the Code states that "[i]f a new matter by way of defense is pleaded in the answer, a reply shall be filed by the plaintiff." 735 ILCS 5/2-602 (West 2018). Every allegation not explicitly denied is admitted. 735 ILCS 5/2-610(b) (West 2018). Supreme Court Rule 182 also states that answers to pleadings must be filed within 21 days of the filing of the pleading. Ill. S. Ct. R. 182(a) (eff. Jan. 1, 1967). However, a reply is not necessary under section 2-602 if the added allegations are not new and the existing complaint already negates them. *Central Illinois Public Service Co. v. Molinarolo*, 223 Ill. App. 3d 471, 473 (1992). In addition, our supreme court rules give trial courts broad discretion in setting and extending the deadlines for the filing of pleadings. See *Vision Point of Sale, Inc. v. Haas*, 226 Ill. 2d 334, 344-45 (2007); see also Ill. S. Ct. R. 183 (eff. Feb. 16, 2011) (for good cause shown, the trial court "may extend the time for filing any pleading or the doing of any act which is required by the rules to be done within a limited period, either before or after expiration of the time.").

¶ 61        The record demonstrates that Buecker filed her complaint in October 2015, claiming consumer fraud, common law fraud, and breach of contract. On February 8, 2017, after 18 months

19

of discovery, motions to compel and amended pleadings, Buecker filed a second amended complaint, claiming fraud and breach of contract, and alleging that Betterway refused to finish the roof. Defendants promptly answered the complaint, asserted their own affirmative defenses, and filed an amended countercomplaint. On March 31, 2017, Buecker filed an answer to defendants' countercomplaint. Her answer included several affirmative defenses based on fraud, breach of contract, and estoppel, and asserted that Betterway refused to finish the roof. Defendants failed to file an answer to those affirmative defenses within 21 days. At the hearing on the motion to deem facts admitted, defendants stated that they believed the affirmative defenses did not include a new matter and that no reply was necessary. The trial court agreed. Given the similarity of the allegations in Buecker's affirmative defenses to the claims previously made, we find no abuse of discretion in the court's decision to deny the motion to deem facts admitted and allow the late response. See *Vision Point of Sale*, 226 Ill. 2d at 344-45.

¶ 62                                          IV. Consumer Fraud Claim

¶ 63        Next, plaintiffs challenge the trial court entry of judgment in favor of defendants on Buecker's consumer fraud claims.

¶ 64        In reviewing a judgment entered after a bench trial, the trial court's findings will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence presented at trial. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 154 (2005).

¶ 65        To succeed in a private cause of action under the Consumer Fraud Act, a plaintiff must prove "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff

rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002).

¶ 66     In denying relief on the consumer fraud claims, the court found that Buecker failed to prove that defendants refused to finish the job and therefore were required to reimburse her under the Consumer Fraud Act. The court also found that Buecker failed to prove that defendants did not know how to install a metal roof or that the additional $10,000 was for Smith's bonus and not more materials. Thus, the court essentially concluded that Buecker failed to prove that defendants had committed a deceptive act with the intent that she rely on the deception. The court's conclusion was premised on the court's assessment of the credibility of the witnesses and its determination regarding the proper weight to be afforded the evidence. The trial court, as the trier of fact, is in the best position to make those determinations. See *Central Illinois Electrical Services, LLC v. Slepian*, 358 Ill. App. 3d 545, 550 (2005). Based on our careful review of the record, the trial court's decision was not against the manifest weight of the evidence.

¶ 67                    V. Attorney Fees Award

¶ 68     Last, plaintiffs' claim that the judgment awarded is so excessive that the trial court abused its discretion in refusing an additional remittitur. Specifically, they argue that the attorney fees and liquidated damages provisions of the contract are unconscionable and that the attorney fees awarded were unreasonable.

¶ 69     A contract is unconscionable when it is "improvident, oppressive, or totally one-sided." *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191 (1983). Damages for breach by either party may be liquidated in an agreement, but only at an amount that is reasonable based on the anticipated or actual loss incurred by the breach and the difficulty of proving the loss. *Kinkel v.*

21

*Cingular Wireless LLC*, 223 Ill. 2d 1, 28 (2006). Whether a contract or a portion of a contract is unconscionable is a question of law, which we review *de novo. Id*. at 22.

¶ 70　　　The terms in Betterway's home repair contract, including the liquidated damages clause and the attorney fees provision, are nonnegotiable and presented in fine print in language that the average consumer might not fully understand. These contracts, however, are not uncommon. Homeowners routinely sign agreements that contain similar terms to obtain credit cards, internet services, loans, and home repairs. See *id*. at 26 (noting that contracts with nonnegotiable terms in fine print are common in modern life and are not necessarily unconscionable). It cannot reasonably be said that such contracts are so unconscionable as to be unenforceable. In this case, the contract Buecker signed contained common provisions for a home repair agreement. It described the work Betterway was obligated to perform, outlined the charges approved and payments made, provided terms and conditions for performance, and included a pamphlet explaining Buecker's consumer rights. It was not oppressive or one-sided.

¶ 71　　　The question then becomes whether the attorney fees were reasonable. Generally, a party is responsible for her own attorney fees. *Abdul-Karim v. First Federal Savings & Loan Ass'n of Champaign*, 101 Ill. 2d 400, 412 (1984). An exception exists when a contract provides for an award of attorney fees and those terms must be strictly construed. *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 488 (1999). The party seeking fees has the burden of presenting the trier of fact with sufficient evidence from which it can determine the reasonableness of the fees. *Mercado v. Calumet Federal Savings & Loan Ass'n*, 196 Ill. App. 3d 483, 493 (1990). Under a contract providing for reasonable attorney fees, an attorney is entitled to be paid for the services rendered as demonstrated by the evidence. *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 282-83 (2001). When a contract calls for shifting of attorney fees, the trier of

22

fact should award all reasonable fees. *Id.* at 282. Attorney fees may be reasonable even if the fees are disproportionate to the monetary amount of an award of damages. *Id.* at 283.

¶ 72 Unlike findings in a fee petition case, which rest within the sound discretion of the trial judge, the reasonableness of attorney fees in a common law breach of contract action presents a question to be resolved by the trier of fact following a trial. *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 597 (2000). On review, " '[i]t is not the province of this court to substitute its judgment for that of a jury' unless there is a 'patent error wherein the weight of the evidence demands a contrary conclusion.' " *Id.* (quoting *Sokol v. Mortimer*, 81 Ill. App. 3d 2d 55, 64 (1967)).

¶ 73 At trial, defendants presented the attorney-client contracts, invoices and account statements from two attorneys who represented them during litigation. Those documents revealed that Buecker filed an LM complaint in October 2015 that did not go to trial until August 2017. During that two-year period, defendants incurred $55,000 in attorney fees as a result of numerous pleadings, correspondence, extensive discovery, and pretrial motions. The jury considered the evidence regarding attorney fees and determined that those fees were reasonable. Buecker stipulated to the admission of those documents, and she did not present any evidence to dispute the reasonableness of the fees. We cannot say that the jury's finding is against the manifest weight of the evidence. The jury's finding was supported by the record and the trial court did not err in refusing to enter an additional remittitur.

¶ 74                                   CONCLUSION

¶ 75 The judgment of the circuit court of Tazewell County is affirmed.

¶ 76 Affirmed.